**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| ROBERT M. GLEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO.: \_\_\_-_____ |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

<u>COMPLAINT</u>

Plaintiff Robert M. Glen ("**Glen**") hereby files this action against Defendant American Airlines, Inc. ("**American Airlines**"), and respectfully states as follows:

I.    <u>INTRODUCTION</u>

1.    This action arises under the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021 *et seq.* (the "**Act**"), also known as the LIBERTAD Act or the Helms-Burton Act.

2.    Title III of the Act provides U.S. nationals whose property in Cuba was confiscated by the communist Cuban government with a private right of action against those who traffic in, or participate in the trafficking of, that property.

3.    Glen holds a claim to two beachfront properties located in Varadero, Cuba, on the Hicacos Peninsula. Varadero is one of Cuba's most popular beach resort towns, featuring one of the Caribbean's best beaches and dozens of hotels and resorts that attract tourists and vacationers from around the world. Varadero is also the site of one of Cuba's busiest international airports.

4.    Following the communist Cuban revolution, the properties were confiscated from Glen's family by the Cuban government. After the revolution, Glen's family fled Cuba, and Glen later became a naturalized U.S. citizen.

5.      Today, the two properties are the site of four separate beachfront resorts, which together feature over 1,400 guestrooms, in addition to dozens of swimming pools, restaurants, and bars.

6.      Under the Act, a person is liable for trafficking in confiscated property if that person, among other things, knowingly "engages in a commercial activity using or otherwise benefiting from confiscated property," or knowingly "participates in, or profits from, trafficking . . . by another person."

7.      American Airlines operates multiple flights per day from Miami International Airport to destinations in Cuba, including Varadero. Travelers can book these flights through American Airlines' main website, www.aa.com.

8.      Not only can American Airlines customers book flights to Cuba on the American Airlines website, but they can also book hotels for their stay in Cuba.

9.      American Airlines facilitates such bookings through www.bookaahotels.com ("**Book AA Hotels**"), an American Airlines website that provides booking services for hotels in Cuba, including the four beachfront resorts on the properties confiscated from Glen's family: the Iberostar Tainos, the Meliá Las Antillas, the Blau Varadero, and the Starfish Varadero.

10.     American Airlines directs customers to Book AA Hotels through a "Hotels" link from its main website. Customers can reserve accommodations using Book AA Hotels whether or not they purchase a flight on American Airlines. And American Airlines customers can earn extra American Airlines loyalty points by booking a room through Book AA Hotels.

11.     By facilitating bookings at these hotels, American Airlines is engaging in commercial activity that uses or otherwise benefits from Glen's confiscated property. American Airlines is also participating in, and profiting from, trafficking committed by the hotels themselves.

12.    Because American Airlines has trafficked in confiscated property in violation of the Act, it is subject to Glen's private action for civil damages under Title III, measured as the greater of the current fair market value of the property, or the value of the property at the time of confiscation plus interest.

13.    Glen accordingly brings this statutory action to vindicate his claim to confiscated property and to obtain the compensation that he is rightfully entitled to under the Act.

## II.    PARTIES

14.    Plaintiff Robert M. Glen is an individual residing in Plano, Texas. Glen is a naturalized United States citizen and a "United States national" pursuant to 22 U.S.C. § 6023(15).

15.    Defendant American Airlines, Inc. is a corporation chartered in Delaware. American Airlines may be served through its registered agent in Florida at the following address: CT Corporation System, 1200 S. Pine Island Road, Plantation, Florida 33324.

## III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Glen's claim arises under 22 U.S.C. § 6082 and the amount-in-controversy exceeds the sum or value of $50,000, exclusive of interest, costs, and attorneys' fees.

17.    This Court may exercise personal jurisdiction over American Airlines because American Airlines' affiliations with Florida are so continuous and systematic so as to render it essentially at home in Florida. This Court may alternatively exercise personal jurisdiction over American Airlines because American Airlines is conducting or carrying on a business from within Florida, and Glen's claim arises from American Airlines' activities in Florida.

18.    Venue in this District is proper under 28 U.S.C. § 1391(b)(1) because, for purposes of this civil action, American Airlines is a resident of the State in which this District is located.

Venue in this District is alternatively proper under 28 U.S.C. § 1391(b)(2) because American Airlines is trafficking in Glen's property from within this District.

## IV.    STATEMENT OF FACTS

### A.    Passage and Implementation of the Act

19.    The Act became effective March 12, 1996.

20.    Among the Act's legislative purposes is to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime."

21.    Title III of the Act ("**Title III**") establishes a private right of action for money damages against any person who "traffics" in confiscated property.

22.    Glen did not previously have an opportunity to bring a private right of action because, until recently, private rights of action under Title III were suspended pursuant to the authority given to the President of the United States by Congress under the Act.

23.    The President has delegated this suspension authority to the United States Secretary of State. On March 4, 2019, the State Department announced a partial lifting of the suspension to permit private actions to proceed, beginning March 19, 2019, against Cuban entities or sub-entities identified on the State Department's restricted entities list. On or about April 2, 2019, the partial lifting of the suspension was extended again through May 1, 2019. Most recently, on April 17, 2019, the State Department announced a full lifting of the suspension, beginning May 2, 2019.

24.    In his remarks regarding the decision, Secretary of State Pompeo made clear that "[e]ffective May 2nd . . . the right to bring an action under Title III of the Libertad Act will be implemented in full."

### B.    Glen's Claim to Property in Cuba

25.    Glen is the owner of property located in Varadero, Cuba that was originally owned by Glen's great-grandfather, Sergio de la Vega, who lived in Cárdenas, across the bay from the

Hicacos Peninsula. Glen's great-grandfather traveled by boat to the peninsula and built improvements upon it.

26.     Ownership of the property later passed to Glen's grandfather, Manuel de la Vega. When Manuel died in 1928, the properties passed to his wife, Ana Maria Martinez Andreu ("**Martinez Andreu**"), Glen's grandmother.

27.     Manuel and Martinez Andreu divided their property into two, contiguous plots. The first was known as "**Blancarena**," and included 280 meters of ocean frontage.

28.     The second was known as "**Cotepen**" (short for "Co-Territorial Peninsula") and included 715 meters of ocean frontage. (Together, Blancarena and Cotepen are the "**Glen Properties**"). Glen's family built a small home on the Glen Properties.

29.     Cotepen is contiguous to Blancarena and sits directly to the east of Blancarena. Cotepen and Blancarena are of equal depth, each extending southward toward the present-day Autopista Sur, the main road that traverses the peninsula.

30.     When Martinez Andreu died, Blancarena passed to Elvira de la Vega Martinez ("**Elvira**"), one of Martinez Andreu's two daughters, and Cotepen passed to Ana Maria de la Vega Martinez ("**Ana Maria**"), Martinez Andreu's other daughter. Elvira is Glen's mother. Ana Maria is Glen's aunt.

31.     Elvira and Ana Maria exercised ownership over Blancarena and Cotepen and worked to develop the land. In the late 1950s, Elvira considered selling a portion of Blancarena and subdividing it, but her plans were interrupted by the revolution.

32.     Maps and surveys drawn in 1958, just prior to the Cuban revolution, reflect the location of the Glen Properties on the peninsula, including in connection with the construction of a canal (still in existence today) directly to the south of the properties.

33.    After January 1, 1959, and in connection with Cuban revolution, the communist Cuban government confiscated the Glen Properties.

34.    Following the revolution, Ana Maria and Elvira fled Cuba.

35.    When Ana Maria and Elvira died, ownership of Blancarena and Cotepen passed solely to Glen.

36.    Like Ana Mara and Elvira, Glen has continued to maintain a claim to the Glen Properties.

37.    On information and belief, the Cuban government maintains possession of the Glen Properties.

38.    The Cuban government has not paid any compensation to Glen or his family for its seizure of the Glen Properties. Instead, as detailed below, the Cuban government has worked with hotel chains to build, develop, and operate four beachfront resorts on the Glen Properties.

**C.    The Beachfront Hotels Occupying the Glen Properties**

39.    Varadero sits on the Hicacos Peninsula. The narrow peninsula, which is approximately eleven miles long but only a mile or so wide, extends in a northeasterly direction from the northern side of the Cuban mainland. The northern side of the peninsula faces the open ocean and features miles of contiguous, white-sand beach. The southern side of the peninsula faces the Bay of Cárdenas.

40.    Today, Varadero is one of Cuba's most popular beach resort towns, featuring one of the Caribbean's best beaches, dozens of hotels and resorts, a nature reserve, and other amenities.

41.    According to TripAdvisor's 2019 Travelers' Choice awards, Varadero is the second-best beach in the world. And according to Lonely Planet, Varadero boasts a beach that is "undoubtedly one of the Caribbean's best."

42.    Because of its world-renowned beach and accessibility, Varadero is a popular destination for tourists from around the world, particularly Europe and Canada. The resort town is easily accessible from Juan Gualberto Gómez Airport, one of Cuba's busiest international airports.

43.    The Glen Properties are the site of four separate beachfront hotels, which run contiguously from west to east along the northern, beachfront side of the peninsula.

44.    Blancarena is the site of Iberostar Tainos, operated by Spanish hotel chain Iberostar (the "**Iberostar Tainos**"). The Iberostar Tainos is a four-star, all-inclusive reports featuring 272 guestrooms.

45.    Cotepen is the site of three resorts. The first is currently known as Meliá Las Antillas (the "**Las Antillas**"), operated by Spanish hotel chain Meliá Hotels International, on the site of a former Beaches-brand resort. Las Antillas is a four-star, adults-only, all-inclusive resort featuring 350 guestrooms. The second is known as the Blau Varadero (the "**Blau**"). The Blau is an adults-only, all-inclusive resort featuring 395 guestrooms. The third is known as the Starfish Varadero (the "**Starfish**"). The Starfish is a family friendly, all-inclusive resort featuring 411 rooms. (Together, the Iberostar Tainos, Las Antillas, Blau, and Starfish are the "**Subject Hotels**").

46.    In addition to their over 1,400 guestrooms, the Subject Hotels also feature restaurants, bars, swimming pools, and other amenities.

47.    The Subject Hotels have never paid any compensation to Glen or his family to operate on the Glen Properties. Nor do the Subject Hotels have Glen's authorization to do so.

**D.    American Airlines' Operations in Florida and Focus on Cuba**

48.    American Airlines operates over 550 daily departures from 16 cities in Florida. From Miami, American Airlines offers 338 daily departures, serving 127 destinations.

49.    The majority of American Airlines' Florida operations are based at Miami International Airport, an American Airlines hub since 1989, and where American Airlines currently operates its largest international hub and gateway to Latin America and the Caribbean.

50.    American Airlines is by far the most prominent airline at Miami International Airport, accounting for approximately 74% percent of its total air traffic.

51.    In 2018, American Airlines carried nearly 30 million passengers through Miami International Airport.

52.    According to American Airlines marketing materials, its "growth and expansion at Miami since 1989 is one of the most remarkable success stories in the history of commercial aviation."

53.    American Airlines also employs over 13,500 team members at the airport, making it the third-largest largest private employer in Miami-Dade County. American Airlines estimates that its operations in Miami account for the creation of over 100,000 jobs through ancillary businesses.

54.    Indeed, according to American Airlines, it "is a critically important economic engine for Miami and South Florida, and its commitment to the region is evidenced by its long-term plans to remain a partner in the success of South Florida." According to the airline, it contributes $6.5 billion annually to South Florida's economy.

55.    Miami is the foundation for American Airlines' industry-leading presence in Latin America, including Cuba.

56.    American Airlines commenced air service to Cuba from Miami in 2016. American Airlines is the leading U.S. airline to Cuba by volume, with daily flights from Miami to Varadero,

Havana, Camaguey, Holguin, Santa Clara, and Santiago de Cuba. American Airlines does not currently fly to Cuba from any location other than Miami.

57.    Miami International Airport is also home to American Airlines' largest cargo station, from which it moves nearly one million pounds of carbo every day. Last year, American Airlines became the first U.S. passenger carrier to begin cargo service in Cuba.

**E.    American Airlines Is Trafficking in the Glen Properties Through Book AA Hotels**

58.    American Airlines operates multiple flights per day from Miami International Airport to destinations in Cuba, including to Varadero. Travelers can book these flights through American Airlines' main website, www.aa.com.

59.    Not only can American Airlines customers book flights to Cuba on the American Airlines website, but they can also book accommodations for during their stay in Cuba, through the Book AA Hotels website.

60.    American Airlines provides online booking services for the Subject Hotels in Cuba through Book AA Hotels.

61.    American Airlines directs customers to Book AA Hotels through a "Hotels" link from its main website. Customers can reserve accommodations using Book AA Hotels whether or not they purchase a flight on American Airlines.

62.    The American Airlines name and logo is featured prominently on the Book AA Hotels website.

63.    So too are advertisements for American Airlines' loyalty program, AAdvantage. For example, Book AA Hotels customers can currently earn up to 10,000 AAdvantage miles per night booked on Book AA Hotels, plus 2,000 additional miles for the customer's first booking through the website.

64.     American Airlines features information about travel to Cuba on Book AA Hotels. For example, American Airlines lists the "Top reasons to visit" Varadero: "beaches, tropical weather, tranquility."



65.     Users can access information about each Subject Hotel using Book AA Hotels, including each Subject Hotel's amenities and policies.

66.     As of the date of the filing of this Complaint, users can book hotel rooms at the Subject Hotels by using Book AA Hotels.

67.     Upon information and belief, American Airlines customers have reserved accommodations in Cuba using Book AA Hotels in conjunction with purchasing a flight on American Airlines from Miami International Airport to destinations in Cuba, including Varadero.

## V.     JURY TRIAL DEMAND

68.     Glen hereby demands a trial by jury on all issues so triable.

## VI.    <u>CAUSE OF ACTION</u>

**Trafficking in Confiscated Property**
**22 U.S.C. § 6082(a)**

69.    Glen incorporates by reference all of the allegations set forth in all the preceding paragraphs of the Complaint as if fully set forth herein.

70.    Glen is a U.S. national and holds a claim to property that was confiscated by the Cuban government after January 1, 1959, namely, the Glen Properties.

71.    American Airlines is a "person" as defined by 22 U.S.C. § 6023(11).

72.    American Airlines has, and continues to, knowingly traffic in the Glen Properties by engaging in commercial activity using or otherwise benefiting from confiscated property, including by facilitating the booking of guestrooms at the Subject Hotels through Book AA Hotels, including guestrooms packaged with American Airlines flight reservations to destinations in Cuba, including Varadero.

73.    American Airlines has, and continues to, knowingly traffic in the Glen Properties by participating in, or profiting from, trafficking committed by the Subject Hotels, including the Subject Hotels' operation of beachfront resorts on the Glen Properties.

74.    At all relevant times, American Airlines has conducted such trafficking without Glen's authorization.

75.    The fair market value of the Glen Properties far exceeds $50,000, exclusive of interest, costs, and attorneys' fees.

76.    Glen was not eligible to file a claim with the Foreign Claims Settlement Commission.

77.     In compliance with 22 U.S.C. § 6082(a)(3)(B), Glen provided notice of his claims at least 30 days before initiating this action. After the end of the 30-day period, American Airlines continued to traffic in the Glen Properties.

## VII.    DEMAND FOR RELIEF

WHEREFORE, Glen respectfully asks the Court to enter judgment in his favor against American Airlines:

    a.    Awarding actual damages in an amount to be determined under 22 U.S.C. § 6082(a)(1)(A)(i);

    b.    Awarding treble damages pursuant to 22 U.S.C. § 6082(a)(3)(B);

    c.    Ordering American Airlines to pay Glen's reasonable attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a)(1)(A)(ii);

    d.    Awarding pre-judgment and post-judgment interest at the highest rates allowed by law; and

    e.    Granting such other and further relief that the Court deems just and proper.

Dated: September 26, 2019.        Respectfully submitted,

/s/ Joel Ewusiak
Joel Ewusiak
joel@ewusiaklaw.com;
eservicecourtdocs@gmail.com
Ewusiak Law, P.A.
Fla. Bar No.:  0509361
6601 Memorial Highway, Suite 311
Tampa, FL 33615
T:  727.286.3559
F:  727.286.3219

Craig A. Boneau (*pro hac vice* pending)
cboneau@rctlegal.com
Ryan M. Goldstein (*pro hac vice* pending)
rgoldstein@rctlegal.com
Scott Saldaña (*pro hac vice* pending)
ssaldana@rctlegal.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy

Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129

*Counsel for Robert M. Glen*